Case No. 25-20586

# In the United States Court of Appeals for the Fifth Circuit

NE SHORE TECHNOLOGIES, INCORPORATED,
PLAINTIFF – APPELLANT

V.

PROFESSIONAL CREDENTIALS EXCHANGE, INCORPORATED,
DEFENDANT – APPELLEE

On Appeal from the United States District Court
Southern District of Texas, Houston Division
No. 4:23-CV-03413, the Honorable Sim Lake, Presiding

## OPENING BRIEF OF APPELLANT

Clouthier Law, PLLC
Susan J. Clouthier TBN 24062673
James R. Close TBN 24079789
9950 Woodloch Forest Dr, Ste 1300
The Woodlands, Texas 77380
Telephone: (346) 443-4300
Fax: (346) 443-4343
susan@clouthierlaw.com

**Attorney for Appellant**
**NE Shore Technologies, Inc.**

**ORAL ARGUMENT REQUESTED**

## Certificate of Interested Persons

Pursuant to 5th Cir. R. 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| District Judge: | Sim Lake |
| Magistrate Judge: | Christina A. Bryant |
| Appellant: | NE Shore Technologies, Inc. |
| Counsel for Appellant: | Susan J. Clouthier<br>James R. Close<br>Clouthier Law, PLLC<br>9950 Woodloch Forest Dr, Ste 1300<br>The Woodlands, Texas 77380 |
| Trial Counsel for Appellant: | Gene P. Tausk<br>6525 Washington Ave.<br>Houston, TX 77007 |
| Counsel for Appellee: | Kathryn Skagerberg<br>John Ackley<br>Nelson Mullins Riley & Scarborough, LLP<br>1111 Bagby Street, Suite 2100<br>Houston, TX 77002 |

/s/ ***Susan J. Clouthier***
Susan J. Clouthier

## Statement Regarding Oral Argument

Appellant NE Shore Technologies, Inc. respectfully requests oral argument. Although Appellant maintains that the enforceability of the contract at issue, breach thereof, and tortious interference by Appellee in Appellant's contractual relationships are adequately addressed in the pleadings, briefing, and record, Appellant submits that oral argument would materially assist the Court in resolving these issues. The instant claims arise from a multi-year software development relationship governed by a written agreement, and involve disputed issues of contract enforceability, breach of the agreement, and tortious interference with established contractual relationships. Oral argument would enable the parties to address these contested matters more fully, thereby promoting clarity and efficiency in the Court's decisional process. Accordingly, Appellant respectfully requests that this Honorable Court grant oral argument.

## TABLE OF CONTENTS


Certificate of Interested Persons ........ ii

Statement Regarding Oral Argument ........ iii

Table of Authorities ........ vi

Subject Matter and Appellate Jurisdiction ........ 1

Statement of the Issues ........ 2

Statement of the Case ........ 4

I. Relevant facts and procedural history. ........ 4

B. ProCredEx's inducement of Pratik Parekh to breach his non-disclosure agreement, and breach of the MSDA. ........ 8

C. Relevant Procedural History. ........ 12

II. ProCredEx's Motion for Summary Judgment. ........ 12

Summary of the Argument ........ 13

Argument and Authorities ........ 17

I. Standard of review. ........ 17

II. The district court erred in granting ProCredEx's motion for summary judgment because the MSDA is a valid, enforceable contract with sufficiently definite terms. ........ 19

A. The MSDA is sufficiently definite in its terms to be enforceable. ........ 19

B. The MSDA is not a "master services agreement." ........ 25

C. Written work statements are not a condition

precedent to the MSDA's enforceability. .................... 26

III. Alternatively, even assuming that written Work Statements are a condition precedent to the enforceability of the MSDA, ProCredEx cannot rely on their absence where it was responsible for their issuance. ........................................... 28

IV. The district court erred in granting ProCredEx's motion because the MSDA is not terminable at will and ProCredEx terminated the Agreement without cause or without providing contractually required notice. ............................ 31

V. The district court erred in granting summary judgment as to damages because its ruling is derivative of its incorrect interpretation of the MSDA. .............................................. 33

VI. ProCredEx tortiously interfered with NE Shore's contractual relationship with Parekh by inducing Parekh to leave NE Shore and start a competing business using Appellant's confidential information. ................................ 35

VII. Any subsequent award of attorney's fees to ProCredEx would be erroneous. .......................................................... 42

Conclusion ........................................................................... 42

Certificate of Service ............................................................. 44

Certificate of Compliance ....................................................... 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*America's Favorite Chicken Co. v. Samaras*,
929 S.W.2d 617 (Tex. App. — San Antonio 1996, writ denied) ..........20

*Ancor Holdings, L.P. v. Landon Cap. Partners, L.L.C.*,
114 F.4th 382 (5th Cir. 2024) ..................................................35, 36, 40

*APS Cap. Corp. v. Mesa Air Grp., Inc.*,
580 F.3d 265 (5th Cir. 2009)...................................................................20

*Ashe v. Corley*,
992 F.2d 540 (5th Cir. 1993)...................................................................30

*Beck v. Tex. State Bd. of Dental Exam'rs*,
204 F.3d 629 (5th Cir. 2000)...................................................................17

*Bias v. Standard Guar. Ins. Co.*,
385 Fed. Appx. 398 (5th Cir. 2010).......................................................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................30

*Clear Lake City Water Auth. v. Clear Lake Util. Co.*,
549 S.W.2d 385 (Tex. 1977) ...................................................................23

*Coe v. Chesapeake Expl., L.L.C.*,
695 F.3d 311 (5th Cir. 2012)...................................................................19

*Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*,
86 F.4th 667 (5th Cir. 2023) ...................................................................18

*Farbwerke Hoeschst A.G. v. M/V "Don Nicky"*,
589 F.2d 795 (5th Cir. 1979)....................18

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*,
380 F.3d 849 (5th Cir. 2004)....................23, 24

*Gonzalez v. Denning*,
394 F.3d 388 (5th Cir. 2004)....................24

*Homoki v. Conversion Servs., Inc.*,
717 F.3d 388 (5th Cir. 2013)....................40, 41

*In re Deepwater Horizon*,
786 F.3d 344 (5th Cir. 2015)....................28, 29

*Kennett-Murray Corp. v. Bone*,
622 F.2d 887 (5th Cir. 1980)....................18

*King v. Baylor Univ.*,
46 F.4th 344 (5th Cir. 2022) ....................Passim

*Lavespere v. Niagara Mach. & Tool Works, Inc.*,
910 F.2d 167 (5th Cir. 1990)....................17

*Lewis v. Bank of Am. NA*,
343 F.3d 540 (5th Cir. 2003)....................19

*Matter of Pirani*,
824 F.3d 483 (5th Cir. 2016)....................26, 27

*Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*,
68 F.4th 206 (5th Cir. 2023) ....................34

*Page v. Gulf Oil Corp.*,
775 F.2d 1311 (5th Cir. 1985)....................25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)....................17

*Shafer v. Army & Air Force Exch. Serv.*,
376 F.3d 386 (5th Cir. 2004) .......... 16, 42

*Thurman v. Sears, Roebuck & Co.*,
952 F.2d 128 (5th Cir. 1992) .......... 17

**Statutes**

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1332 .......... 1

**Rules**

Fed. R. App. P. 4 .......... 1

Fed. R. App. P. 32(a)(5) .......... 45

Fed. R. App. P. 32(a)(6) .......... 45

Fed. R. App. P. 32(a)(7)(B)(i) .......... 45

## SUBJECT MATTER AND APPELLATE JURISDICTION

**Subject Matter Jurisdiction in the District Court**. The district court from which this appeal is taken had jurisdiction of this action pursuant to 28 U.S.C. § 1332, commonly referred to as diversity jurisdiction.

**Jurisdiction in the Court of Appeals**. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Jurisdiction under this statute is proper because this appeal is from a final decision rendered and entered in the United States District Court for the Southern District of Texas on December 2, 2025. ROA.1762.

This appeal is timely under the provisions of Rule 4 of the Federal Rules of Appellate Procedure because the Final Judgment was entered on December 2, 2025, and the Notice of Appeal was filed on December 18, 2025. ROA.1762, 1866.

## STATEMENT OF THE ISSUES

1. The district court erred in granting summary judgment on Appellant's breach of contract claim where the Master Software Development Agreement contains sufficiently definite terms regarding the nature of the services, pricing, and duration; expressly contemplates performance in furtherance of a software development project which is consistent with the parties' actual performance under the agreement for multiple years; and contains no express conditional language requiring written Work Statements as a prerequisite to performance but contemplates Deliverables arising under the Agreement itself.

2. Alternatively, the district court erred in granting summary judgment where any failure to issue written Work Statements was caused by Appellee, which controlled the assignment of work and chose to proceed through verbal directives, thereby precluding it from relying on the non-occurrence of that condition under the prevention doctrine.

3. The district court erred in concluding that the Master Software Development Agreement was terminable at will and that no breach

occurred, where the contract's duration is ascertainable by reference to the project it governs or, alternatively, requires implication of a reasonable duration under Texas law, and where the contract permits termination only for cause upon sixty days' written notice and an opportunity to cure, which Appellee failed to provide.

4. The district court erred in granting summary judgment on damages based on its conclusion that the Master Software Development Agreement imposed no obligation on Appellee to engage Appellant, where that conclusion rests on an erroneous interpretation of the contract and where Appellant presented expert testimony establishing damages.

5. The district court erred in granting summary judgment on Appellant's claim for tortious interference with an existing contract by finding no evidence of intentional interference with a contract, where the record contains evidence that Appellee knowingly induced Appellant's employee (who was subject to a non-disclosure agreement) to leave Appellant's employment and form a competing business using Appellant's confidential information, and where

that interference was a substantial factor in causing the breach of Appellant's contractual rights.

6. In the event that the district court awards Appellee attorneys' fees pursuant to its pending request, such award would be error as Appellee would not be the prevailing party.

## STATEMENT OF THE CASE

### I. Relevant facts and procedural history.

#### A. The Project and the MSDA.

Appellant, NE Shore Technologies, Inc. is engaged in the business of recruiting and supplying software development talent, predominantly from India, to deliver software development services on client projects. ROA.1414, 1426. In January 2020, NE Shore was engaged by Appellee, ProCredEx, Inc., in connection with the development of a credentialing platform (the "Project"). ROA.800-02, 805-06, 823-24, 785, 1424-25, 1428, 1431, 1434, 1445. NE Shore curated, maintained, and supplied a valuable "network" of Indian software programmers and developers whose collective talent and knowledge base were highly valued by ProCredEx and played an important role in the ongoing development of its platform (the "Network"). ROA.1414-16, 1426, 1429, 1444, 1434.

NE Shore's acting officer in this matter is Manuel Fernandes, who worked with ProCredEx's Chief Technology Officer, Matt Sylvestre, in connection with the Project. ROA.1413, 1423, 1430. Prior to the instant dispute, Mr. Fernandes and Mr. Sylvestre were friends, and had also worked together on multiple projects with different companies for approximately 25 years prior to the Project at issue in this lawsuit. ROA.1432, 1448.

In connection with the Project, the parties entered into a Master Software Development Agreement (the "MSDA" or "Agreement"). ROA.785, 799-802, 1427-28, 1430, 1459. The MSDA provides for NE Shore to furnish "Development Deliverables," which arise out of the overarching "Development Program," defined as "the activities undertaken by the parties hereunder for the development of the Software and Documentation satisfying the Specifications pursuant to this Agreement." ROA.786. "Deliverables" are defined as "the Software, all Code, Documentation and other materials developed for or delivered to [ProCredEx] by [NE Shore] under this Agreement *and under any Work Statement issued hereunder*." ROA.786. (emphasis added).

The MSDA further provides that Deliverables will be described in

written "Work Statements." ROA.785. In this case, all assignments in furtherance of the Project/Development Program were initiated by ProCredEx, and NE Shore provided no input in that regard. ROA.1429, 1414-15.

NE Shore's compensation under the Agreement consisted of hourly rates set forth in a Statement of Rates which is referenced in the MSDA. ROA.788. The MSDA further requires NE Shore to invoice ProCredEx for its services monthly, and provides when ProCredEx is required to pay said invoices. ROA.788. Over the course of the Project, NE Shore did invoice ProCredEx for its services, and Appellee paid said invoices. ROA.1427.

ProCredEx had the express right to terminate the entire MSDA for cause. ROA.792-93. The MSDA defines "cause" for termination of the Agreement as: (i) the persistent or repeated failure of NE Shore to supply properly skilled workers or proper materials; or (ii) NE Shore's material breach of the Contract Documents that is not cured within sixty (60) days after written notice. ROA.793. NE Shore also had the right to terminate the MSDA if ProCredEx failed to provide pertinent information necessary for performance. ROA.792-93.

The Project was large and dynamic in nature. ROA.804-06. ProCredEx continuously prioritized Deliverables and adapted to new requirements and changing technologies as the work progressed. ROA.804-06. Deliverables were assigned to NE Shore based on these evolving priorities, and NE Shore completed the assigned tasks accordingly so that key functionalities of the ProCredEx credentialing platform could be delivered and launched within the required timeframe. ROA.804-06. NE Shore performed work on the Project as assigned by ProCredEx from January 2020 until May 2023, and the work performed by NE Shore was satisfactory. ROA.1415, 1447, 1427.

Despite the MSDA contemplating written Work Statements that would describe and define the scope of Deliverables to be furnished, no such written instruments were ever used by ProCredEx during this timeframe. ROA.805. Instead, Deliverables were assigned to NE Shore by ProCredEx informally through frequent verbal Agile meetings and biweekly prioritization. ROA.805-06.

A large and critical component of ProCredEx's platform was its blockchain or distributed ledger technology ("DLT"), which was implemented in June 2020. ROA.1431, 1434-35, 1439, 1442. NE Shore

and Mr. Fernandes worked specifically on the DLT component, of which Fernandes had very detailed and specific knowledge. ROA.1441. ProCredEx was "dependent" on Fernandes and NE Shore regarding this critical component of its platform. ROA.1443-44.

As the Project progressed, increasing costs and budget constraints created tension between the parties. ROA.1443, 1470, 1464-65, 826-27. The DLT component of the platform was complicated and expensive. ROA.1443. ProCredEx paid Appellant's invoices, but Sylvestre recounted asking NE Shore to delay billing occasionally to future months when invoices would exceed ProCredEx's monthly budget. ROA.1470. Further, demands from the Network of Indian developers resulted in NE Shore raising its rates for services provided to ProCredEx during the Project, which exacerbated the parties' financial tensions. ROA.1464-65, 826-27.

### B. ProCredEx's inducement of Pratik Parekh to breach his non-disclosure agreement, and breach of the MSDA.

Pratik Parekh was an employee of NE Shore beginning in 2008, and played many roles in the company, including the critical role of recruiting skilled workers in India. ROA.829-30, 835-36, 1438. Parekh worked with Mr. Fernandes and Mr. Sylvestre on various projects since

between 2006 and 2010. ROA.1432. In 2008, Mr. Parekh signed a Non-Disclosure Agreement in connection with his employment relationship with NE Shore (the "NDA"). ROA.892.

The NDA prohibited Mr. Parekh from (1) using NE Shore's "Confidential Information" for his own use or for any purpose other than in the context of his business relationship with NE Shore; (2) disclosing "Confidential Information" to unauthorized parties; and (3) failing to protect said information with the highest degree of care. ROA.892. The NDA broadly defines "Confidential Information" to include "*any information, technical data or know-how*, including *but not limited to* that which relates to research, product plans, products, services, customers, markets, software, developments, inventions, processes, designs, drawings, engineering, hardware configuration information, marketing or finances of the Company, which all shall be deemed as Confidential Information." ROA.892 (emphasis added). Parekh's obligations under the NDA survive termination of the relationship for three years. ROA.892.

Parekh became involved in the ProCredEx Project at the insistence of Sylvestre, which required Parekh to be diverted from a different

project. ROA.836, 846. In November 2022, Sylvestre, acting on behalf of ProCredEx, spoke directly with Parekh regarding the Project and its DLT component. ROA.1438. In this interaction, Parekh learned from Sylvestre what ProCredEx was paying NE Shore for its services, and Sylvestre learned what Parekh and the Network of Indian developers were being paid by NE Shore. ROA.1438, 1471-72. Sylvestre related to Parekh that ProCredEx was willing to pay a higher amount to Parekh and the Network of Indian developers directly for services in connection with the DLT component of the Project. ROA.1472, 1437.

As a result of this November 2022 interaction, ProCredEx determined to eliminate NE Shore from the Project, and Parekh decided to leave NE Shore and form a new business entity. ROA.1471-72. The entity, PCube, was formed by Parekh after the November 2022 interaction, and ultimately hired multiple NE Shore employees and used NE Shore resources. ROA.1460, 1417, 830. Because of its dependence on Fernandes for the DLT component, ProCredEx developed a strategy to replace the component with something functionally similar. ROA.1446, 1455. Between November 2022 and May 2023, Sylvestre discussed ProCredEx's new "technical direction" concerning the Java

blockchain/DLT component which would allow the elimination of NE Shore from the Project, and Parekh worked on "the technology" for ProCredEx. ROA.1446, 1471-72.

In early May 2023, ProCredEx replaced the DLT component on which Fernandes was working with a functionally similar component after a "great deal of effort and time." ROA.1443. On May 5, 2023, Sylvestre sent Fernandes an email immediately terminating NE Shore's involvement in the Project. ROA.891. Discussions between Fernandes and Sylvestre after the termination reveal that tensions over the rates charged by NE Shore were a basis for ProCredEx's decision. ROA.826-27.

After NE Shore's termination, Fernandes received notice that several of NE Shore's Indian workers, including Parekh, were resigning from the company, and later learned that these employees were working with ProCredEx through PCube. ROA.1417. At this point, PCube replaced NE Shore in the critical function of locating skilled workers in India for the Project. ROA.1460, 1483. By switching to PCube, ProCredEx saved money while benefitting from the services, resources and personnel that NE Shore had previously provided. ROA.1478, 1471,

1460, 1417, 830.

### C. Relevant Procedural History.

NE Shore filed its initial Complaint in this matter on September 12, 2023 and filed an Amended Complaint on October 5, 2023, asserting claims against ProCredEx for breach of contract, tortious interference with an existing contract, tortious interference with prospective relations, and trade secret misappropriation. ROA.11, 52-70. On October 25, 2023, ProCredEx filed a motion to dismiss under Rule 12(b)(6). ROA.84. Appellant again amended its complaint on October 26, 2023. ROA.423.

On July 16, 2024, ProCredEx's motion to dismiss was granted, and Appellant was ordered to amend its complaint as to its claims for breach of contract and tortious interference with an existing contract within 14 days of the court's order. ROA.571. An extension of time for the filing of the amended complaint was granted, and Appellant filed its Second Amended Complaint on August 15, 2024. ROA.578, 586.

## II. ProCredEx's Motion for Summary Judgment.

On July 9, 2025, ProCredEx filed the instant motion for summary judgment. ROA.766. On the same date, ProCredEx filed its Rule 702

Motion to Exclude Anthony Cardiel's Opinions. ROA.895. On October 30, 2025, the Magistrate Judge recommended granting Appellee's motion for summary judgment, finding that NE Shore's claim for breach of the MSDA could not survive for three reasons, namely (1) the MSDA was not a binding, enforceable contract; (2) the MSDA was terminable at will; and (3) Appellant could not prove damages. ROA.1703. The Magistrate Judge further recommended granting ProCredEx's motion as to Appellant's claim for tortious interference with an existing contract, finding that Appellant failed to present evidence that ProCredEx contracted with NE Shore employees or induced the employees to quit working with NE Shore. ROA.1711. The Magistrate Judge did not rule on Appellee's motion to exclude Mr. Cardiel's expert opinions. ROA.1708. A Final Judgment adopting the Magistrate Judge's recommendations was signed in this matter on December 2, 2025, dismissing Appellant's claims with prejudice. ROA.1762. On December 12, 2025, Appellee filed a Motion for Attorney's Fees and Costs, which remains pending as of the time of this filing. ROA.1763.

## SUMMARY OF THE ARGUMENT

ProCredEx entered into a contract with NE Shore to provide

software development talent and services to build ProCredEx's credentialing platform software. For three years, NE Shore performed under this contract, sourcing top talent from its Network of developers in India and building the platform that defined ProCredEx's business. Throughout that period, ProCredEx directed every aspect of NE Shore's work, accepted every Deliverable NE Shore produced, and paid every invoice NE Shore submitted until the abrupt termination of NE Shore from the Project without cause and without notice and opportunity to cure as required by the MSDA.

The reason for this abrupt termination is clear: ProCredEx's own Chief Technology Officer secretly convinced NE Shore's key recruiter to leave the company, start a competing company providing similar services using NE Shore's confidential information, and then ProCredEx replaced NE Shore with this new company at a lower cost. Having engineered that replacement using NE Shore's own confidential Network and resources, ProCredEx then took the position that the MSDA under which it had performed for three years *was never enforceable at all*. This Court should decline the invitation to reward that maneuver.

The district court erred in granting summary judgment on NE Shore's breach of contract claim based on its conclusion that the MSDA is not an enforceable contract under Texas law. The MSDA contains sufficiently definite terms regarding the nature of the services to be performed, the price to be paid, and the duration of the Agreement. The Agreement was executed to govern a specific software development Project, and the district court erred in treating the MSDA as an unenforceable master services agreement and construing written Work Statements as a condition precedent to enforceability.

Alternatively, even if written Work Statements were a condition precedent, ProCredEx cannot rely on their absence where ProCredEx controlled the assignment of work and chose to proceed through verbal Agile meetings and biweekly prioritization rather than written Work Statements.

The district court also erred in finding that the MSDA was terminable at will and that ProCredEx did not breach the Agreement. The MSDA's duration is ascertainable by reference to the Project it governs, or alternatively, a reasonable duration must be implied under Texas law. Because the MSDA is not terminable at will, ProCredEx was

required to comply with the Agreement's termination provisions, including the requirement of cause and sixty days' written notice and opportunity to cure.

The district court further erred in granting summary judgment as to damages on Appellant's breach of contract claim. The court's damages ruling is derivative of its erroneous interpretation of the MSDA. Further, NE Shore submitted evidence, including Anthony Cardiel's expert report, showing ascertainable damages based on NE Shore's historical billing before termination.

Finally, the district court erred in granting summary judgment on NE Shore's tortious interference claim. The record contains evidence that Sylvestre, acting for ProCredEx, induced Parekh to leave NE Shore, form PCube, and use NE Shore's Network and confidential information so that ProCredEx could obtain the same services at a reduced cost. NE Shore further suffered ascertainable damages as a result of this interference. At minimum, the evidence creates a genuine issue of material fact as to ProCredEx's interference with NE Shore's contractual relationship with

Parekh, including Parekh's obligations under the NDA.[1]

## ARGUMENT AND AUTHORITIES

### I. Standard of review.

This Court reviews a district court's grant of summary judgment *de novo*. *Bias v. Standard Guar. Ins. Co.*, 385 Fed. Appx. 398, 400 (5th Cir. 2010) (*citing Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000)). Summary judgment is only proper when "there is an absence of genuine issues of material fact and one party is entitled to judgment as a matter of law." *Id.* (*citing Thurman v. Sears, Roebuck & Co.*, 952 F.2d 128, 131 (5th Cir. 1992)). In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Before finding that there are no genuine issues of material fact, this Court must be satisfied that no

[1] Out of an abundance of caution, Appellant notes that although ProCredEx has argued that the MSDA is unenforceable, it has nonetheless requested attorney's fees pursuant to that same agreement as the purported prevailing party. To the extent the district court awards such fees subsequent to this filing, any such award would be erroneous, as ProCredEx is not the prevailing party for the reasons set forth herein. This issue is addressed fully in Section VII of the Argument. *See Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 399 (5th Cir. 2004), *clarified*, No. 03-10074, 2004 WL 2107672 (5th Cir. Sept. 17, 2004).

reasonable factfinder could have found for the nonmoving party. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citations omitted), cert. denied, 114 S.Ct. 171 (1993).

A court must not resolve factual disputes by weighing conflicting evidence since it is the province of the jury to assess the probative value of the evidence. *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (*citing Farbwerke Hoeschst A.G. v. M/V "Don Nicky"*, 589 F.2d 795, 798 (5th Cir. 1979)). In other words, if a legal conclusion rests on factual determinations, summary judgment is not proper. *See id.*

A district court's interpretation of a contract is a matter of law reviewable *de novo*. *Elmen Holdings, L.L.C. v. Martin Marietta Materials, Inc.*, 86 F.4th 667, 674–75 (5th Cir. 2023). This Court reviews the record independently and under the same standard that guided the district court." *Id.* at 675. In a diversity case involving the interpretation of a contract, this Court applies the substantive law of Texas according to the general principles of contract interpretation articulated by the Texas Supreme Court. *Id.*

## II. The district court erred in granting ProCredEx's motion for summary judgment because the MSDA is a valid, enforceable contract with sufficiently definite terms.

The MSDA is a binding, enforceable contract that governs ProCredEx's engagement of NE Shore for the development of their credentialing software platform. The elements of a breach of contract claim under Texas law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544–45 (5th Cir. 2003). It is not disputed that the parties entered into the MSDA in January 2020. ROA.1424-25. It is also undisputed that the credentialing software Project was the only possible engagement for which ProCredEx would have hired NE Shore in this matter. ROA.1459. The evidence further shows that NE Shore performed satisfactorily. ROA.1447.

### A. The MSDA is sufficiently definite in its terms to be enforceable.

The pivotal question before this Honorable Court is whether the MSDA is sufficiently definite in its terms to create a binding contract under Texas law. ROA.1704. To be enforceable, the terms of an agreement must be sufficiently definite to enable the court to understand

each party's obligations. *Coe v. Chesapeake Expl., L.L.C.,* 695 F.3d 311, 320 (5th Cir. 2012). To this end, a contract must address all of its essential and material terms with a reasonable degree of certainty and definiteness. *King v. Baylor Univ.*, 46 F.4th 344, 357–58 (5th Cir. 2022). "Essential terms" are the provisions the parties would reasonably regard as the most important elements of their agreement, and ordinarily encompass the time of performance, the price to be paid, and the nature of the services to be rendered. *Id.* at 358.

The nature of the services provided by NE Shore to ProCredEx is squarely covered by the MSDA. In construing an agreement, the court may consider evidence of circumstances surrounding its execution. *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 622 (Tex. App. — San Antonio 1996, writ denied). Courts look not only at any relevant written agreements but also at the relationship of the parties, their course of dealings, and then answer the field- and fact-specific question of whether essential terms were sufficiently settled to find a contract. *APS Cap. Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272–73 (5th Cir. 2009).

The MSDA was entered into at the outset of the Project, in January

2020. ROA.799-802, 805-06, 823-24, 1387, 1424-25, 1428, 1431, 1434, 1445. The MSDA expressly governs the Project, *i.e.*, the "Development Program," and supplies the comprehensive contractual framework and mechanisms for NE Shore to provide software development services, including the creation of Software, Code, Documentation, and Deliverables "arising out of" the Project/Development Program. ROA.785-87. The parties' three year course of performance demonstrates that services were being provided by NE Shore for no reason other than in the furtherance of the Project/Development Program. ROA.1415, 1447, 1427, 1459.

The MSDA further addresses the price to be paid by ProCredEx for NE Shore's services. Under Texas law, a contract may incorporate an unsigned document by reference if the signed agreement plainly refers to that other writing. *King,* 46 F.4th at 359. No particular words are required to incorporate another document by reference. *Id.* Rather, it is sufficient if the contract plainly refers to the other document. *Id.* Once incorporated by reference, the documents are read and construed together as a single agreement. *Id.*

Section 3(a) of the Agreement provides that NE Shore's hourly rates

are set by its then-current “Statement of Rates,” are in lieu of other compensation or reimbursement, and may change with 60 days’ advance notice, without affecting rates for already-rendered work. ROA.788. Consistent with these compensation terms, Section 4 of the MSDA sets forth the invoicing and payment obligations. ROA.788. NE Shore was required to invoice ProCredEx on a monthly basis for the first billing period of each month, with payment due within Net Thirty (30) days. ROA.788. ProCredEx was obligated to pay all invoices in U.S. dollars as submitted. ROA.788. The Agreement further provided NE Shore with the right to assess late fees of 1.5% per month on any undisputed overdue amounts and to suspend or terminate work if payment was not received within sixty (60) days. ROA.788.

When a contract plainly refers to invoices, statements, or rate schedules for purposes of payment, that reference incorporates the specific amounts or pricing details from said invoices into the contract with reasonable certainty and definiteness. *See King*, 46 F.4th at 359–60. This is especially true where the contract also refers to due dates for said invoices, as a due date without an ascertainable amount due would be meaningless, and courts must construe contracts to give effect to every

provision. *Id.* The MSDA plainly refers to, and thereby incorporates, a Statement of Rates and individualized invoices that sufficiently define the price required of ProCredEx for services rendered in the furtherance of the Project. *See id.* The parties' three year course of performance further confirms their understanding and agreement as to price.

The MSDA is likewise sufficiently definite concerning duration. Duration is sufficiently definite if the contract, read in context, fixes an ascertainable fact or event by which the end of the contract can be determined. *See King*, 46 F.4th at 358. The MSDA's duration in this case is readily ascertainable because it governs the parties' relationship concerning the Project/Development Program. ROA.785-87. The MSDA was executed for the specific purpose of governing the development and delivery of the Software and Deliverables comprising the Project/Development Program. ROA.785-87. When the Project is complete, the purpose of the MSDA is fulfilled and its duration ends. ROA.823-24.

Alternatively, and assuming for the sake of argument that the life of the Project were not an ascertainable fact or event from which the end of the MSDA could be determined, the Texas Supreme Court has

recognized that, in certain circumstances, a reasonable time should be read into an otherwise indefinite contract. *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 857 (5th Cir. 2004) (*citing Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 390 (Tex. 1977)). A contract's contemplation of a party's substantial expenditure is a prerequisite for reading in a reasonable duration contract term. *Id.*

The MSDA provides that NE Shore shall bear all of its own expenses arising from its performance of its obligations under the MSDA and each Work Statement issued thereunder, including without limitation NE Shore's facilities, work space, utilities, management, clerical, reproduction services, supplies, and other related expenses. ROA.788. These provisions necessarily contemplate that NE Shore would incur significant and ongoing operational costs in staffing, maintaining, and deploying its developer Network in support of the Project. To the extent that the life cycle of the Project does not determine the duration of the MSDA, a reasonable duration must be implied to give effect to the parties' intent. Determination of a reasonable time during which a contract must be performed is, of course, a fact question that is not appropriate for determination on summary judgment. *Gonzalez v.*

*Denning*, 394 F.3d 388, 395 (5th Cir. 2004).

### B. The MSDA is not a "master services agreement."

The district court incorrectly concluded that the MSDA was an unenforceable "master services agreement," likening it to an agreement addressed by this Court in *Page v. Gulf Oil Corp.*, 775 F.2d 1311 (5th Cir. 1985). ROA.1705-06. As such, the district court treated the issuance of written Work Statements as a condition precedent to the enforceability of the MSDA. ROA.1706. *Page* is distinguishable from this matter, however, as the agreement therein merely confirmed the parties' "understanding" concerning "any kind of work [the plaintiff] *may be* requested to perform from time to time" for the defendant. *Id.* at 1315. The *Page* agreement imposed no obligation on the defendant to engage the plaintiff for any services, but created only a suspensive condition that depended entirely on the defendant's whim and was applicable only "when, as, and if" the defendant decided to request work. *Id.*

By contrast, the MSDA was executed specifically to govern a single, large, and defined software development Project/Development Program. ROA.785-86, 1459. Indeed, the three year course of the parties' performance demonstrates that the MSDA *did* govern the Project, with

satisfactory performance by NE Shore until ProCredEx's improper termination of Appellant, making the MSDA fundamentally different from the indefinite, non-binding framework rejected in *Page*. ROA.1415, 1447, 1427, 1459. *Page* is not only distinguishable, it is inapt.

### C. Written work statements are not a condition precedent to the MSDA's enforceability.

The absence of written Work Statements in the parties' performance under the MSDA is of no moment. A condition precedent to a party's obligation to perform is an act or event that occurs after the contract is formed and that must take place before that party has a right to immediate performance and before any breach of contract can occur. *Matter of Pirani*, 824 F.3d 483, 497 (5th Cir. 2016). Texas law disfavors conditions precedent because of their harsh operation. *Id.* When the parties' intent is doubtful, or where interpreting a provision as a condition would produce an absurd, impossible, or forfeitable result, courts will construe the language as a *covenant* rather than a *condition. Id.*

The express language of the instant MSDA suggests that the parties did not intend for written Work Statements to be a condition precedent to the enforceability of the contract. First, there is no

conditional language which indicates that written Work Statements are mandatory. Texas courts generally require the use of express conditional language, such as "if," "provided that," "on condition that," or similar phrasing, to create a condition precedent. *Id.* The MSDA provides that "[a]ll Deliverables provided will be described in" written Work Statements. ROA.785. This language is *descriptive* rather than *conditional*, and does not clearly establish that written Work Statements are a prerequisite to contractual performance or enforceability.

Further, the MSDA defines "Deliverables" as "the Software, all Code, Documentation and other materials developed for or delivered to [ProCredEx] by [NE Shore] under this Agreement *and* under any Work Statement issued hereunder." ROA.786 (emphasis added). The use of the inclusive phrase "under this Agreement *and* under any Work Statement" confirms that the parties contemplated Deliverables, and therefore enforceable performance, potentially arising directly under the MSDA itself, independent of any particular Work Statement. ROA.786 (emphasis added). This is consistent with the parties' three year course of performance, in which Deliverables were assigned through regular verbal Agile meetings and biweekly prioritization rather than through

formal Work Statements. ROA.805-06.

The MSDA is a valid and enforceable contract that contains all essential terms with reasonable certainty and definiteness. The Agreement was specifically executed to govern the development of ProCredEx's credentialing platform, and did in fact govern years of actual performance. The district court erred in granting summary judgment by mischaracterizing the MSDA as an unenforceable master services agreement, and Appellant respectfully requests that the Final Judgment of the district court be reversed and this matter be remanded.

## III. Alternatively, even assuming that written Work Statements are a condition precedent to the enforceability of the MSDA, ProCredEx cannot rely on their absence where it was responsible for their issuance.

Even if the district court were correct in concluding that written Work Statements are a condition precedent to enforceability, summary judgment was nevertheless improper because ProCredEx cannot rely on the absence of a condition that it unilaterally and improperly caused. The failure of a condition precedent to occur excuses the performance of the party whose obligations are dependent on that condition. *In re Deepwater Horizon,* 786 F.3d 344, 361 (5th Cir. 2015). However, a party's failure to fulfill a contractual promise is not excused by the non-occurrence of a

condition that the party itself caused or prevented. *Id.* Under the prevention doctrine, if a promisor is responsible for the failure of a condition upon which its own liability depends, it cannot take advantage of that failure. *Id.*

Even assuming *arguendo* that the MSDA requires assignments of Deliverables to be made in written Work Statements, ProCredEx was responsible for issuing those Work Statements but failed to do so. The testimony shows that all assignments concerning the Project in this matter originated from ProCredEx, and that NE Shore gave no input. ROA.1429, 1414-15. The testimony further reveals that ProCredEx assigned Deliverables to NE Shore informally through regular verbal Agile meetings and biweekly prioritization rather than through formal Work Statements. ROA.805-06. NE Shore furnished the assigned Deliverables in accordance with these verbal assignments, and invoiced ProCredEx as required under the MSDA. ROA.1447, 1427.

ProCredEx cannot withhold the very Work Statements that would have triggered its obligations and then rely on their absence to avoid liability. *See In re Deepwater Horizon*, 786 F.3d at 361-62. (enforcing a settlement agreement despite the claimant's failure to sign a release

where the defendant prevented that condition from occurring). Rule 56(c) requires summary judgment against a party who fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party must first demonstrate the absence of any genuine issue of material fact before the non-moving party is required to come forward with opposing evidence. *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993). Mere conclusory assertions that the non-moving party has no evidence are insufficient. *Id.* (*citing Celotex*, 477 U.S. at 328 (White, J., concurring)).

ProCredEx's motion for summary judgment is predicated on the absence of written Work Statements. ROA.776. The prevention doctrine, however, prohibits ProCredEx from taking advantage of its failure to provide written Work Statements in this matter to satisfy its burden under Rule 56. Appellee's assertion that there is no evidence of an enforceable contract is therefore conclusory and insufficient to shift the burden to NE Shore. Because the burden never shifted to Appellant, the district court's grant of Appellee's motion was erroneous.

However, even if the burden shifted, the record establishes that the

alleged condition precedent was either satisfied or excused under the prevention doctrine, as ProCredEx unilaterally and improperly chose to proceed through verbal assignments rather than written Work Statements. Summary judgment based on the enforceability of the MSDA was therefore inappropriate, and NE Shore respectfully requests that the Final Judgment of the district court be reversed and this matter be remanded.

## IV. The district court erred in granting ProCredEx's motion because the MSDA is not terminable at will and ProCredEx terminated the Agreement without cause or without providing contractually required notice.

The evidence demonstrates that the MSDA is an enforceable contract and that ProCredEx breached it by failing to comply with the Agreement's notice and termination provisions. The district court incorrectly concluded that there was no issue as to breach of the MSDA based entirely on the flawed finding that the MSDA is indefinite as to duration and therefore terminable at will. ROA.1707. As discussed in detail in Section II above, however, the MSDA is not indefinite in duration and therefore was not terminable at will. Rather, the MSDA's terms and definitions provide that Deliverables and Work Statements are in furtherance of the broader Development Program or Project.

ROA.785-86, 1459. The MSDA thus depends on the Project for its existence, and therefore terminates upon completion of the Project.

The MSDA provides that ProCredEx could terminate the Agreement for cause, which is defined as "(i) [t]he persistent or repeated failure of [NE Shore] to supply properly skilled workers or proper materials; and/or (ii) [NE Shore's] material breach of the Contract Documents that is not cured within sixty (60) days after written notice." ROA.792-93. There is no evidence that NE Shore persistently or repeatedly failed to supply skilled workers or proper materials, nor that it committed any uncured material breach. In fact, the evidence shows that NE Shore's performance was satisfactory and that ProCredEx's purported grievance with Appellant was based on alleged "usurious" employment practices, reflecting a frustration with market rates versus a breach of the Agreement by NE Shore. ROA.1447. The record reflects that this asserted grievance was merely a pretext, however, for ProCredEx's effort to bypass NE Shore and obtain the same services directly from its Network at a lower cost, as discussed in Section VI below.

Even if NE Shore had committed a material breach, ProCredEx was

contractually required to provide sixty (60) days' written notice and an opportunity to cure, which it failed to do. ROA.792-93. Instead, ProCredEx abruptly terminated NE Shore's involvement in the Project during ongoing performance, without cause or the required notice. ROA.828-29. The abrupt termination of the MSDA by ProCredEx without cause was a breach of the MSDA that entitles Appellant to damages. Appellant therefore respectfully requests that the Final Judgment of the district court be reversed and this matter be remanded.

**V. The district court erred in granting summary judgment as to damages because its ruling is derivative of its incorrect interpretation of the MSDA.**

The district court erroneously found that Appellant could not prove entitlement to damages on its breach of contract claim based on its incorrect interpretation that the MSDA does not obligate ProCredEx to engage NE Shore at all. ROA.1708. As discussed above, this is simply an incorrect reading of the Agreement that assumes that the MSDA's scope concerns only random *ad hoc* engagements and not services in connection with the overarching Project/Development Program. The district court's unduly restrictive interpretation of the MSDA ignores express language that establishes that all Deliverables and thus all written Work

Statements "arise out of" the Development Program/Project and therefore are not *ad hoc*. ROA.785-87.

The goal of measuring damages for a breach-of-contract claim is to provide just compensation for any loss or damage actually sustained as a result of the breach. *Nat'l Oilwell Varco, L.P. v. Auto-Dril, Inc.*, 68 F.4th 206, 216–17 (5th Cir. 2023). The normal measure in such cases is the benefit of the bargain, which seeks to place the injured party in the economic position it would have been in had the contract been performed. *Id.* at 217. NE Shore submitted evidence in support of its damages, namely, the expert report of Anthony Cardiel which shows that Appellant's breach of contract damages are over $80,000, based on Mr. Cardiel's calculation that the average monthly billing in the 12 months prior to termination was $40,405. ROA.1403-05. Notably, ProCredEx challenged the admissibility of Mr. Cardiel's report, but the district court did not rule on that challenge and instead held that Appellant's damages theory failed irrespective of admissibility. ROA.895, 1708.

The district court's damages ruling is entirely derivative of its erroneous interpretation of the MSDA. NE Shore suffered ascertainable

damages resulting from ProCredEx's breach. ROA.1403-05. At minimum, the evidence creates a genuine issue of material fact as to damages, and NE Shore therefore respectfully requests that the Final Judgment of the district court be reversed and this matter be remanded.

## VI. ProCredEx tortiously interfered with NE Shore's contractual relationship with Parekh by inducing Parekh to leave NE Shore and start a competing business using Appellant's confidential information.

Sylvestre, acting on behalf of ProCredEx, exploited known compensation tensions between NE Shore and its Network of Indian developers by inducing Parekh to leave NE Shore and form a competing business through which ProCredEx could access the Network at a reduced cost. To establish tortious interference with a contract, a plaintiff must show that the defendant willfully and intentionally interfered with the contract. *Ancor Holdings, L.P. v. Landon Cap. Partners, L.L.C.*, 114 F.4th 382, 398 (5th Cir. 2024). This requires evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under the agreement. *Id.* The defendant must have had actual knowledge of the contract or knowledge of facts and circumstances that would lead a reasonable person to believe the contract existed. *Id.* at 398-99. The plaintiff is not required to prove that the defendant intended to cause

injury, but need only show through direct or circumstantial evidence that the defendant desired the consequences of its act or believed those consequences were substantially certain to result. *Id.* at 399.

ProCredEx specifically interfered with two contracts: (1) NE Shore's employment relationship with Parekh; and (2) Parekh's Non-Disclosure Agreement with NE Shore. Parekh was an employee of NE Shore at all pertinent times, and performed NE Shore's critical function of recruiting talent from India. ROA.829-30, 835-36, 1438. ProCredEx acknowledges that Parekh, as well as other Indian developers, were NE Shore employees. ROA.1438. ProCredEx further acknowledges that Parekh entered into a Non-Disclosure Agreement with NE Shore in 2008. ROA.892, 780. This NDA prohibits Parekh from using any "Confidential Information" of NE Shore for his own use. ROA.892. "Confidential Information" is defined broadly, and this definition reasonably encompasses NE Shore's Network of Indian developers and the associated recruiting and compensation structures that Parekh used in forming PCube. ROA.892, 1414-16, 1426, 1429, 1444, 1434.

ProCredEx's inducement of Parekh arose from financial tension between ProCredEx and NE Shore. Specifically, Sylvestre testified that

the DLT component of the Project became expensive, and that at certain points, NE Shore's invoices exceeded ProCredEx's monthly budget which required him to request that billing be delayed to future months. ROA.1443, 1470. Critically, Sylvestre recounted NE Shore raising its rates in response to demands from its Network of Indian developers. ROA.1464-65. These escalating compensation demands created a clear economic pressure point that ProCredEx exploited to restructure its access to NE Shore's Network.

Sylvestre had a longstanding working relationship with Parekh which predated the Project. ROA.1432. During the Project, Sylvestre *insisted* that Parekh become involved, which required NE Shore to divert Parekh from a different engagement. ROA.846. In November 2022, Sylvestre spoke to Parekh directly[2] and revealed to Parekh what ProCredEx was paying NE Shore in connection with the Project, and also learned from Parekh what NE Shore was paying its Network of Indian developers in connection with the Project. ROA.1438, 1471-72. Sylvestre further related to Parekh that ProCredEx was willing to pay the Indian

[2] ProCredEx contends that Fernandes instructed Sylvestre to reach out to Parekh, but this is based solely on Sylvestre's self-serving testimony and is not confirmed by the testimony of Fernandes. ROA.1432. Fernandes testifies that Parekh became involved in the Project at Sylvestre's insistence. ROA.846.

developers more money. ROA.1472, 1437. The result of this discussion between Sylvestre and Parekh was that Sylvestre and ProCredEx decided to eliminate NE Shore from the Project,[3] and Parekh decided to form a new business entity, PCube, which would ultimately utilize NE Shore employees and resources. ROA.1471, 1460, 1417, 830.

ProCredEx was dependent on Fernandes and NE Shore for the critical DLT component of its platform, and therefore Appellee's plan involved replacing that component with a functionally similar component. ROA.1443-44, 1446, 1455. ProCredEx involved Parekh in this plan, and Sylvestre spoke with Parekh concerning this new "technical direction" between November 2022 and May 2023. ROA.1446, 1452. During this time period, Parekh worked "primarily" for ProCredEx on this "technology." ROA.1446, 1471-72. In early May 2023, and after "a great deal of effort and time," ProCredEx replaced the DLT component with a similar component, terminated NE Shore, and replaced NE Shore

[3] Sylvestre asserts that ProCredEx's actions were motivated by purportedly "usurious" practices by NE Shore. ROA.1447. This contention is legally irrelevant, as the MSDA required notice and an opportunity to cure regardless of ProCredEx's subjective dissatisfaction. Moreover, the record reflects that no such concerns were raised with Fernandes prior to termination, and post-termination discussions focused on NE Shore's billing rates rather than any alleged employment practices. ROA.1432, 1448, 826–27.

with PCube for the provision of Indian talent in connection with the Project. ROA.1443, 891, 1460, 1483.

The evidence clearly establishes that Sylvestre, acting as the CTO of ProCredEx, was aware that Parekh was an employee of NE Shore, and that Parekh was NE Shore's recruiter in India. ROA.1438, 1432. Sylvestre was aware that NE Shore's Network of Indian developers was a valuable asset, and it would have been reasonable to believe that NE Shore would take steps, such as a Non-Disclosure Agreement, to protect this valuable Network. ROA.1414-16, 1426, 1429, 1444, 1434. In an apparent effort to cut costs, Sylvestre, acting on behalf of ProCredEx, took advantage of known tensions between NE Shore and its Indian workers, and induced Parekh to help develop a new component which would eliminate the necessity for NE Shore, and also start a competing business that utilized NE Shore's confidential Network of Indian developers and resources for the Project. ROA.1470-72, 1437-38, 1471-72, 1460, 1417, 830. This strategy was successful, as ProCredEx did, in fact, save money by switching to PCube. ROA.1478.

The evidence therefore shows that ProCredEx willfully and intentionally interfered with NE Shore's contractual relationship with

Parekh. This interference proximately caused Parekh to leave NE Shore and start a competing business that utilized NE Shore's confidential Network of Indian developers. To establish proximate cause, Appellant must show that ProCredEx's conduct was a substantial factor in causing Parekh to leave and form PCube, and that this would not have occurred but for ProCredEx's interference. *Ancor Holdings, L.P.,* 114 F.4th at 400.

Sylvestre admits that Parekh decided to form PCube as a result of their November 2022 discussion. ROA.1471. This is consistent with the economic incentives Sylvestre created by offering higher compensation directly to Parekh and the Network. ROA.1472, 1437. The record shows clear causation in this case.

Finally, NE Shore presented sufficient evidence of damages resulting from ProCredEx's tortious interference. Tortious interference with contract and breach of contract typically share the same measure of damages: to place the injured party in the position he would have been had the contract been performed. *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 398 (5th Cir. 2013). Lost profits need not be susceptible to exact calculation, but there must be data from which they can be ascertained with a reasonable degree of certainty and exactness. *Id.* Anthony

Cardiel's expert report provides a clear, quantifiable baseline of the hourly margins NE Shore earned from its Indian developer Network, along with detailed replacement costs, and sets forth a straightforward methodology for calculating the resulting damages. ROA.1403-06. A trier of fact could readily apply this data and methodology to determine the damages caused by ProCredEx's interference with a reasonable degree of certainty and exactness.

ProCredEx, through its CTO, induced Parekh to leave his employment with NE Shore, start a competing company, and breach his obligations under the NDA so that ProCredEx could get cheaper labor from India. ProCredEx did not merely hire away an employee; it used that employee to replicate NE Shore's business model and replace it. The district court ignored this evidence and incorrectly concluded that there was no interference. At a minimum, the record presents a genuine issue of material fact as to whether ProCredEx interfered with NE Shore's contractual relationship with Parekh, including his obligations under the NDA, and Appellant respectfully requests that the district court's Final Judgment be reversed and this matter be remanded.

## VII. Any subsequent award of attorney's fees to ProCredEx would be erroneous.

Despite its insistence that the MSDA is unenforceable, ProCredEx nevertheless requested attorney's fees pursuant to the terms of the MSDA as the "prevailing" party in this matter. ROA.1768. At the time of this filing, the district court has not ruled on Appellee's motion. Notwithstanding the apparent incongruity of this request, and out of an abundance of caution, any subsequent award of attorney's fees by the district court on the basis that Appellee is a prevailing party should be reversed by this Honorable Court for the foregoing reasons herein. *See Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 399 (5th Cir. 2004), *clarified*, No. 03-10074, 2004 WL 2107672 (5th Cir. Sept. 17, 2004).

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests and prays that this Honorable Court reverse the district court's grant of Appellee ProCredEx, Inc.'s Motion for Summary Judgment, remand this matter for further proceedings, and for such other relief as this Court deems just.

May 4, 2026

Respectfully submitted,

**CLOUTHIER LAW, PLLC**

/s/ ***Susan J. Clouthier***_
Susan J. Clouthier
Tex. Bar No. 24062673
James R. Close
Tex. Bar No. 24079789
9950 Woodloch Forest Dr, Ste 1300
The Woodlands, Texas 77380
Tel: (346) 443-4300
Fax: (346) 443-4343
susan@clouthierlaw.com

**Counsel for Appellant**
**NE Shore Technologies, Inc.**

## CERTIFICATE OF SERVICE

I certify that on May 4, 2026, the foregoing Brief was filed electronically using the Court's CM/ECF system, which will give notice of the filing to counsel for the Appellee.

I further certify that (1) the required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

I further certify that I will mail the correct number of paper copies of the foregoing document to the Clerk of Court when requested.

/s/ ***Susan J. Clouthier***_
Susan J. Clouthier

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 7,867 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook font size 14.

/s/ ***Susan J. Clouthier***
Susan J. Clouthier